## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

Civil Action No. _____

JUSTIN SCHNEIDER,
individually and on behalf of
THE ESTATE OF WENDY SCHNEIDER,

      Plaintiff(s),

v.

SIG SAUER, INC.

      Defendant.

---

## COMPLAINT (Jury Trial Requested)

---

Plaintiff Justin Schneider, by counsel and for his Complaint seeking judgment against defendant Sig Sauer, Inc. ("SIG"), alleges as follows:

### SUMMARY AND NATURE OF ACTION

This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to defendant Sig Sauer, Inc.'s negligence and defective design of a semi-automatic firearm. Specifically, a striker-fired, semi-automatic gun known as the "P320" that has fired on law enforcement agents and civilians across the nation over the last four years, without the trigger being pulled.

On December 22, 2018, Justin and Wendy Schneider hosted a Christmas party at their home in Rocky Ford, Colorado. As Justin, Wendy and Justin's son Kyle sat around the dinner table looking at the handguns each received as a Christmas gift, Wendy retrieved her SIG P320 to compare. Justin unloaded Wendy's gun by

releasing the magazine and taking the bullet out of the chamber.

Once the family was finished looking at one another's handguns, Justin put the magazine back into the P320 and released the slide. Wendy, seated across the table from Justin, reached for her gun to return it to their bedroom. As Justin handed the P320 to Wendy, it discharged, firing one round through Wendy's finger, perforating her neck, and lodging into the wall of the master bedroom. When the P320 discharged, Justin was holding the gun by its grip, never touching the trigger.

Wendy was taken to Arkansas Valley Regional Medical Center and was ultimately transferred to Parkview Medical Center in Pueblo, Colorado. Upon arrival at Parkview Medical Center, Wendy underwent surgery in an attempt to repair the damage from the gunshot. Wendy was kept on life support until December 29, 2018 and died a short time later.

Schneider's P320 should not have discharged without the trigger being pulled. In its "Safety Without Compromise" marketing materials for the P320, SIG states:

> We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

Despite this express representation, which SIG has made for the last several years to the present, the weapon fired without the trigger being pulled.

Justin Schneider, individually and on behalf of the Estate of Wendy Schneider, brings causes of action under New Hampshire law for negligence, strict products liability, breach of express warranty, breach of implied warranty, negligent and intentional infliction of emotional distress, and wrongful death in view of SIG's misrepresentations about the safety of the weapon. Defendant SIG, moreover, had

knowledge, as early as February 2016, if not long before, that the P320, its first striker-fired pistol, was capable of firing by itself without the trigger being pulled due to a defective firing assembly inside the gun. For many years since the weapon was first introduced to the market in 2014, SIG has recklessly failed to recall it despite knowing of many grievous wounds it has inflicted on law enforcement agents and civilians across the country.

### JURISDICTION

1.      Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff Schneider is a citizen of the United States and the State of Colorado. Defendant Sig Sauer, Inc. has a principal place of business in New Hampshire and, accordingly, is a citizen of New Hampshire. The amount in controversy substantially exceeds, exclusive of interest and costs, $75,000.

### VENUE

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1), as Defendant Sig Sauer, Inc., is located in this district and is the only defendant to this action.

### PARTIES

3.      Wendy Schneider was 49 years old on December 22, 2018, when she suffered severe physical injury, which ultimately led to her death as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

4.      Justin Schneider at all times relevant hereto was the husband of Wendy Schneider.

5.     The defendant SIG Sauer, Inc. ("SIG") is a foreign profit corporation with a principal office address of 72 Pease Boulevard, Newington, New Hampshire 03801. SIG designs and manufactures firearms and rifles for military and commercial markets throughout the United States, and internationally. SIG manufacturers its products in the United States, and markets and sells them directly and through dealers. SIG Sauer, Inc. was formerly known as SIGARMS, Inc. and changed its name to SIG Sauer, Inc. in October 2007. It no longer has any affiliation with its former German supplier, SIG Sauer GmbH, which now distributes German-manufactured SIG-branded firearms through a different distributor, Legacy Sports International.

6.     SIG was founded in 1985 and has its principal place of business in Exeter, New Hampshire. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

## ALLEGATIONS

7.     The incident occurred on December 22, 2018, as Justin handed the SIG P320 to Wendy.

8.     As Justin handed the weapon to his wife Wendy, a round discharged from the weapon without the trigger being pulled or touched.

9.     Justin held the weapon by its grip when handing the weapon to Wendy. The gun then fired one round, moving at approximately 1700 mph, which went through Wendy's right pointer finger, through her neck and lodged into the master bedroom wall.

10.     Wendy was rushed to the nearest hospital, Arkansas Valley Medical Center, and was ultimately transferred to Parkview Medical Center for more substantial care.

11.     Wendy was removed from life support on December 29, 2018 and died a short time later at Parkview Medical Center as a result of her injuries.

12.     Years before the incident occurred, through and including the date of this incident, SIG expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



13.     In additional marketing material, under the heading "Striker Safety," defendant SIG SAUER further states that the striker safety "[p]revents the striker from being released unless the trigger is pulled."

14.     However, SIG contradictorily stated in the original owner's manual for the P320, on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered" i.e., inside the firing chamber of the weapon's slide.

15.     It is standard operating procedure for all U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau of Investigation, local

police departments, and the military, at a commander's discretion, to carry pistols with a chambered round.

16.     The P320 is the first striker-fired pistol[1] SIG has manufactured. It assembled it using the same frame from an earlier hammer-fired SIG model, the P250.

17.     While competing for a $580,000,000 contract to supply the United States Army with a new service pistol in 2016, SIG's prototype P320s exhibited nearly 200 malfunctions during Army testing. The Army demanded that SIG fix all problems associated with the prototypes.



---

[1]     A striker-fired pistol is different from the traditional "hammer-fired" pistol. It contains no external hammer to be pulled back by the user; rather an internal "striker" that is held back under spring pressure inside the gun, very much like a bow and arrow. Once the slide is forcibly moved or "racked" backward, the weapon is fully-cocked, as the striker is then under significant spring tension and ready to move forward to impact the round's primer to fire the bullet. The striker is held back by the weapon's sear. In the above illustrative photo of a typical striker-fired pistol; the striker in red is held back by the sear in blue.

18.     On May 10, 2017, after SIG was awarded the contract, the United States Army submitted an urgent Engineering Change Proposal for the prototype P320. The document essentially demanded that SIG change its entire internal firing assembly. SIG complied and made all requested changes to the Army version of the weapon.

19.     However, it left approximately 500,000 P320s to be used by United States law enforcement and civilians in their original, defective condition.

20.     Sometime after January 2017, when a Connecticut law enforcement agent was shot by a P320 when it fell to the ground from less than three feet, SIG removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices. **Careless and improper handling of any firearm can result in unintentional discharge**.

(emphasis in original).

21.     SIG had never before represented that mere "vibration" could cause the

weapon to discharge. Upon information and belief, no other firearms manufacturer has ever made such a representation.

22.     In a 2016 amendment to the user manual, moreover, SIG warned users not to lubricate the striker inside the gun, a normal part of the process of the cleaning and maintenance of any semi-automatic firearm. The striker, as noted, is held back while under spring pressure and rests, in the P320, in tenuous contact with a small piece of metal inside the gun called the weapon's sear.

23.     SIG has also expressly represented, since the P320's manufacture and distribution into the stream of commerce, that the weapon possessed a "robust safety system."



24.     The SIG P320 was originally designed and manufactured in or about 2014, or earlier. The original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, including any normal carrying, holstering, un-holstering, or rough handling in any altercation or combat, including at the time SIG sold the P320 to Wendy in 2017.

25.     Specifically, the P320 possessed an inadequate sear-striker connection,

even after implementing a "voluntary upgrade" program for the gun in 2017, an inadequate internal striker safety, and lacked any external safety or tabbed trigger safety.

26.     In 2018, SIG shipped approximately 9,000 P320s to the Department of Homeland Security, and thousands of others across the country. At that time, it knew, or should have known, that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and accidental discharges that could occur in the ordinary course of using the weapon.

27.     Before it shipped these weapons, SIG was aware of defective, un-commanded discharges of the P320, as well as other SIG pistols, many of which pre-dated the sale to Wendy in 2017.

28.     Upon information and belief, there have been many prior incidents of unintended discharges involving SIG weapons, both hammer and striker-fired, that have discharged without the trigger being pulled, or simply while being handled, accidentally dropped, or while being holstered.

29.     In 2016, a tactical response training instructor near Sacramento dropped his SIG firearm, firing a bullet into a student's truck.

30.     In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving SIG weapons.

31.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, police officer's vehicle when the officer moved to

exit the vehicle during a snowstorm. The incident was captured on the officer's body cam video and shows that no object entered inside his holster at any time.

32.     In 2016, the Surprise, Arizona, police department complained to SIG of two separate incidents of P320s firing without trigger pulls.

33.     SIG failed to disclose the latter three incidents in two separate federal civil actions, despite long outstanding discovery requests, until the last day of discovery in the second proceeding in early 2019.

34.     In October 2016, a P320 fired un-commanded on retired NYPD officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

35.     In November 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

36.     In 2017, a sheriff's deputy in Michigan accidentally discharged a SIG Sauer pistol, striking a schoolteacher in the neck.

37.     On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, an incident directly at odds with SIG's express representations that the weapon is drop safe, cannot fire without a trigger pull, and does not require a safety to be drop safe.

38.     On February 28, 2017, a P320 accidentally discharged while in use by an employee of the University of Cincinnati Police Department.

39.     On June 14, 2017, a P320 accidentally discharged in Wilsonville,

Oregon.

40.     On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, NJ, Police Department.

41.     In June of 2017, SIG shipped approximately 800 P320s to the Loudoun County, Virginia, Sheriff's Department, privately assuring its leadership, Sheriff Michael Chapman, that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[2]

42.     On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

43.     On August 4, 2017, a Stamford, Connecticut SWAT team member, Vincent Sheperis, sued SIG in U.S. District Court in Connecticut for an accidental discharge of a commercial version of the P320 that shot him in his knee.

44.     Four days later, SIG's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

45.     This statement was false, in view of SIG's knowledge that Officer Sheperis in Connecticut had been shot some eight months earlier with the commercial version of the P320, and that several other accidental discharges of the P320 had occurred before that date.

46.     On August 8, 2017, SIG announced a "voluntary upgrade" program for

---

[2]      As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

47.     This statement was also false, as there are no federal government standards for gun safety, a fact known to SIG when it issued this press release.

48.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

49.     SIG's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing non-military, commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, and an improved sear to prevent accidental discharges.

50.     On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

51.     In October 2017, a P320 accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

52.     On November 12, 2017, a P320 accidentally discharged in Tyler, Texas.

53.     In January 2018, upon information and belief, a P320 accidentally discharged in Dallas County, Texas.

54.     On February 7, 2018, Loudoun County, Virginia, deputy sheriff Marcie Vadnais' P320 fired on her, un-commanded, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries and related trauma, ending her career.

55.    Upon CT scanning the weapon, it was found that her P320 had both a design and a manufacturing defect: specifically, crossed and tangled sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

56.    In a civil action relating to the Vadnais incident filed in the United States District Court for the Eastern District of Virginia, defendant SIG filed two motions to preclude Vadnais' weapons experts from testifying. The court denied both Motions in March 2019.

57.    In April 2018, SIG issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

58.    In May 2018, civilian Gunter Walker reported to SIG that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

59.    In June 2018, a Williams County, Ohio, officer reported that his P320 discharged twice in one moment as he was attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver's side door.

60.    In May 2018, a Rancho Cucamonga, California, officer reported that his P320 fired un-commanded while he was walking inside his department locker room. The casing of the spent round did not eject.

61.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

62.    In October 2018, firearms expert and retired law enforcement officer Stephen Mayes' P320 fired on him un-commanded while seated in its holster, causing severe injury to his right leg.

63.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded, causing severe tunneling wounds to his right leg.

64.    On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual Mayfair event near Harvard Square.

65.    The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a SIG-certified armorer[3] on the P320.

66.    Only July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the Somerville, Massachusetts, Police Department hitting him in his leg and causing substantial injuries to his leg.

67.    In August 2019, a Philadelphia transit officer's P320 fired un-commanded while fully holstered, nearly striking a bystander in the subway. The

---

[3]    According to SIG Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.sigsaueracademy.com/course/armorer-certification

incident was captured on video, and the officer was returned to duty the next day.

68.     The transit authority replaced all SIG P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt . . . someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer.
> The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

69.     On September 3, 2019, another P320 in use by the Loudoun County Virginia's sheriff's office fired un-commanded on another Loudon County deputy sheriff, Carl Costello, hitting him in his leg.

70.     On October 10, 2019, officer Jacques Desrosiers, also of the Cambridge, Massachusetts, Police Department, was shot by his P320 without a trigger pull. The round caused severe and life-changing injuries that are too graphic to set forth. The spent casing of the round did not eject.

71.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

72.     The Kneski discharge was investigated by Major Peter J. Villani of the

Veterans Affairs police agency, also a SIG-certified armorer on the P320. In his

report he noted the following:

> After reviewing the Officer's sidearm, it was noted that the P-320 came
> from Sig Sauer to the distributor prior to the point of sale already with
> the "upgrade" completed. The sidearm had approximately 100 rounds
> through it since purchased.

> Upon further examination of the internal parts of the frame module, I
> noticed that the foot of the striker that catches the [sear] has noticeable
> side to side and up and down movement within its channel along with
> upward movement of the slide from the frame. Also, the edge of the
> striker foot which has a height thickness of approximately 2mm, is only
> making contact with approximately .25 of a mm of the leading edge only
> of the disconnector hook. Since the striker has been changed with a
> lighter weight version during the "upgrade program", it is quite possible
> that any abrupt movement or twisting of the P-320 while holstered,
> could cause the foot of the striker to disengage itself from the
> disconnector hook on its own since there is so little contact between the
> striker foot and the [sear].

73.     On November 9, 2019, a P320 fired un-commanded on officer Matthew

Gardette of the Manteca, California, Police Department as he was getting ready for

work. As he merely attempted to place and fasten his duty belt around his waist, the

P320 discharged inside the holster.

74.     The holster was a Safariland level three holster with the hood cover up

securing the pistol. The round blew out the bottom of the holster, impacted the locker

room floor, and missed both Officer Gardette and a fellow officer by inches as it

ricocheted into a locker door.

75.     On December 2, 2019, a P320 fired un-commanded while in the

possession of Detective David Albert, also of the Cambridge, Massachusetts, Police

Department as he was in the process of putting his duty belt on.

76.     In June of 2020, a P320 fired un-commanded on a Pasco County, Florida officer, severely wounding his right leg. This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

77.     In June of 2020, a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster and resulting in a broken bone in the civilian's foot.

78.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to accidental discharges causing injury in both 2016 and 2017.

79.     To date, despite numerous requests in 2017, 2018 and 2019, SIG has not recalled the P320, though it has done so in the past for other of its products with far fewer overall unit sales.

80.     In an interview in 2013, SIG's former Chief Financial Officer, Timothy Scullin, just before the P320 was brought to market in 2014, noted that SIG's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that SIG's Growth has outpaced the firearms' industry's growth by "two or three times."

81.     When asked what some of his biggest professional challenges he has faced in his career, he stated:

> At SIG, to grow this fast, people get really challenged. When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous amount of stress on the people in the system. But we've got people that have risen to the challenge.

## COUNT I
## NEGLIGENCE

82.     Plaintiffs incorporate paragraphs 1 through 81 by reference.

83.     At all relevant times, SIG owed Plaintiffs the duty to exercise reasonable care in designing the P320 weapon before selling the gun and placing it into the stream of commerce, so as to prevent the gun from firing merely upon vibration of the weapon.

84.     At all relevant times, SIG owed Plaintiffs the duty to manufacture, assemble, inspect and/or test its P320s in such a manner, and with the exercise of reasonable care, before selling the gun and placing it into the stream of commerce, so as to prevent it from firing upon handling the weapon.

85.     At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiffs, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.

86.     Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery, long before one of its P320s shot Wendy Schneider in December 2018.

87.     SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

            i.      By failing to use due care in designing and manufacturing the
                    P320's firing and striker assembly so as to prevent un-

commanded discharges;

ii.  By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

iii.  By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iv.  By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

v.  By negligently failing to unambiguously warn purchasers and end users of the gun, including Plaintiffs, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vi.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

viii.   Other negligent acts and omissions to be developed in the course of discovery.

88.     SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

89.     The gun's defective condition was not visible, and Plaintiffs were not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

90.     SIG's negligence as alleged in this Count directly and proximately caused the December 22, 2018, un-commanded discharge and Wendy Schneider's injuries and death resulting from the incident.

91.     As a direct and proximate result of the negligence set forth in this Count, Wendy Schneider suffered severe physical injury resulting in death, and Justin Schneider suffered mental anguish, inconvenience, loss of the capacity for the enjoyment of life, embarrassment associated with criminal charges, loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Mr. Schneider will suffer such losses and impairments in the future. SIG's conduct, as

reflected in this Count, was wanton, malicious, or oppressive such that enhanced compensatory damages should be awarded.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

92.     Plaintiffs incorporate paragraphs 1 through 91 by reference.

93.     At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Wendy Schneider's death.

94.     SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrating" and handling while situated within and without a holster) and all other reasonably foreseeable uses.

95.     At all relevant times, Justin and Wendy Schneider used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

    i.      Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    ii.     Failing to issue a mandatory recall of the P320 as SIG had done

in the past with other defective products;

iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

iv.    Negligently failing to unambiguously warn purchasers and end users of the gun, including Plaintiffs, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which time employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

96.    Wendy Schneider, as purchaser of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein directly

and proximately cause the accident on December 22, 2018 and Wendy Schneider's death.

97.     As a direct and proximate result of the breaches set forth in this Count, Wendy Schneider suffered severe physical injury resulting in death. Justin Schneider suffered from mental anguish, inconvenience, loss of the capacity for the enjoyment of life, embarrassment associated with criminal charges, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Justin Schneider will suffer such losses and impairments in the future. SIG's conduct, as reflected in this Count, was wanton, malicious, or oppressive such that enhanced compensatory damages should be awarded.

## COUNT III
## BREACH OF EXPERESS WARRANTY

98.     Plaintiffs readopt and re-allege all the preceding paragraphs of this Complaint as if fully set forth herein.

99.     At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Wendy Schneider's death. Upon information and belief, SIG knew, or had reason to know, at the time SIG sold the gun, that the gun would be handled in a manner similar to this incident (i.e. releasing the slide and picking up the weapon to move), and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose.

100.    SIG expressly warranted that the P320 would not fire unless the trigger was pulled.

101.   At all relevant times, Wendy and Justin used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun.

102.   SIG breached the above-referenced express warranty as to the gun in that it fired without a trigger pull and was unreasonably dangerous at the time it left SIG's possession by virtue of:

   i.   Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

   ii.   Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

   iii.   Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidently as described above;

   iv.   Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Justin Schneider, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

   v.   Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge

accidently while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood as a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges; and

vii. Expressly warranting that the gun would not fire unless the trigger was pulled.

103.   As a direct and proximate result of the breaches set forth in this Count, Wendy Schneider suffered severe physical injury resulting in death. Justin Schneider suffered from mental anguish, inconvenience, loss of the capacity for the enjoyment of life, embarrassment associated with criminal charges, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Justin Schneider will suffer such losses and impairments in the future. SIG's conduct, as reflected in this Count, was wanton, malicious, or oppressive such that enhanced compensatory damages should be awarded.

## COUNT IV
## STRICT LIABILITY

104.   Plaintiffs readopt and re-allege all the preceding paragraphs of this Complaint as if fully set forth herein.

105.   At all times material hereto, SIG was in the business of marketing,

selling, and distributing weapons, including the gun causing Wendy Schneider's injuries and death. Upon information and belief, SIG knew or had reason to know the gun would be jostled by manipulating the slide so as to disassemble the gun at the time they sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

106.   Accordingly, SIG impliedly warranted that the gun was suitable for the particular purpose of being situated and handled, including manipulating the slide, and was free from any design or manufacturing defect.

107.   At all relevant times, Plaintiffs used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun.

108.   The weapon at issue reached Wendy and Justin Schneider without substantial change in the defective condition in which it was sold.

109.   The weapon at issue contained a design and/or manufacturing defect which made the weapon unreasonably dangerous as it could fire by mere vibration, without a trigger pull. SIG is strictly liable for the design and/or manufacturing defect in Wendy Schneider's P320 and for acting with complete disregard for the Schneiders' safety and those around them.

110.   As a direct and proximate result of the design and/or manufacturing defect, Wendy Schneider suffered severe physical injury resulting in death. Justin Schneider suffered mental anguish, inconvenience, loss of the capacity for the

enjoyment of life, embarrassment associated with criminal charges brought against him, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Justin will suffer such losses and impairments in the future. SIG's conduct, as reflected in this Count, was wanton, malicious, or oppressive such that enhanced compensatory damages should be awarded.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

111. Plaintiff, Justin Schneider, readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

112. Sig owed a duty to the Plaintiffs, and end users of the P320 generally, to ensure that the P320 was free of design and/or manufacturing defects that could cause the gun to discharge without the trigger being pulled. SIG further owed a duty to the Plaintiffs, and end users of the P320 generally, to notify them of such defects in the P320 that could endanger them. In addition, SIG owed a duty to issue a mandatory recall of P320 guns, given SIG's knowledge of design and manufacturing defects imperiling the lives and safety of end users.

113. SIG breached each of its duties owed to the plaintiffs, foreseeably causing Justin Schneider serious and emotional harm accompanied by objective physical symptoms.

114. As a direct and proximate result of the breaches set forth in this Count, Justin Schneider suffered from severe mental anguish, inconvenience, loss of the capacity for the enjoyment of life, embarrassment associated with the criminal charges brought against him, and loss of earnings and earning capacity. These injuries are either

permanent or continuing in their nature and Schneider will suffer such losses and impairments in the future. SIG's conduct, as reflected in this Count, was wanton, malicious, or oppressive such that enhanced compensatory damages should be awarded.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

115.   Plaintiff, Justin Schneider, readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

116.   Upon information and belief, SIG had knowledge of the various defects with the commercial version of the P320 gun more than a year before Wendy Schneider was shot in December 2018.

117.   Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the death of Wendy Schneider.

118.   Had SIG acted responsibly and repaired the defects in the commercial version of the P320 before December 2018, or recalled it as repeatedly requested, Wendy Schneider never would have been shot.

119.   SIG acted, and failed to act, so as to endanger the safety and lives of end users of its products because it sought to save millions in repair costs, by failing to institute a mandatory recall as it had done for other defective SIG weapons, choosing instead to implement a woefully inadequate "voluntary upgrade."

120.   SIG's conduct in this matter as described herein was extreme and outrageous such as to go beyond all possible bounds of decency, and be regarded

as atrocious, and utterly intolerable in a civilized community.

121.   Through SIG's extreme and outrageous conduct, SIG intentionally or recklessly caused Justin Schneider severe emotional distress and was accompanied by criminal charges brought against him, as well as a loss of his faith in god.

122.   As a direct and proximate result of the breaches set forth in this Count, Justin Schneider suffered severe mental anguish, inconvenience, loss of the capacity for the enjoyment of life, embarrassment associated with the criminal charges, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Justin Schneider will suffer such losses and impairments in the future. SIG's conduct, as reflected in this Count, was wanton, malicious, or oppressive such that enhanced compensatory damages should be awarded.

## COUNT VI
## WRONGFUL DEATH

123.   Plaintiffs hereby incorporate all allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

124.   Plaintiff, Justin Schneider, as surviving spouse of decedent has in interest in the estate of the deceased, and may therefore bring a wrongful death claim under N.H. Rev. Stat. § 556:19.

125.   SIG was negligent in its manufacture of its product, the P320, as complained herein. This negligence was the direct and proximate cause of Wendy Schneider's death.

126.   Because of SIG's negligence, Wendy Schneider suffered a wrongful death, for which her estate is entitled to all damages allowed under NH RSA 556:12, including

physical and mental pain and suffering prior to her death; funeral and medical expenses; loss of enjoyment of life; loss of earnings and earning capacity; and out of pocket expenses and other pecuniary losses. Plaintiff brings this suit to recover all damages cognizable under the applicable state and federal law resulting from the injuries of the estate. Additionally, SIG's conduct was wanton, malicious, or oppressive such that enhanced compensatory damages should be awarded.

127.    Due to SIG's negligence, Plaintiff Justin Schneider suffered the loss of Wendy's care, companionship and affection, and other elements of consortium, for which he is entitled to damages pursuant to NH RSA 556:12.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

1.    Assume jurisdiction over this case;

2.    Empanel a jury, and after trial, find the defendant liable for negligence, breach of implied warranty of merchantability, breach of express warranty, strict liability, intentional infliction of emotional distress, negligent infliction of emotional distress, and wrongful death;

3.    Award the Plaintiffs compensatory damages, including but not limited to damages for pain and suffering, emotional distress, humiliation, inconvenience and loss of enjoyment of life;

4.    Award the Plaintiffs enhanced compensatory damages;

5.    Award damages allowed under NH RSA 556:12;

6.    Award the Plaintiffs costs and reasonable attorneys' fees in

bringing the action;

7.  Order defendant to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 stating that the weapon can fire without a trigger pull;

8.  Retain jurisdiction over this case until defendant has complied with all orders of the Court;

9.  Award such other relief as the Court deems just and appropriate.

10.  The plaintiff demands a trial by jury on all counts.

Respectfully submitted,

JUSTIN SCHNEIDER, FOR HIMSELF AND THE ESTATE OF WENDY SCHNEIDER

By Their Attorneys,

Douglas, Leonard & Garvey, P.C.

Date:  12/18/2020        By:    /s/ Benjamin T. King
                                /s/ Megan Douglass
                                Benjamin T. King, Bar No. 12888
                                Megan Douglass, Bar No. 19501
                                Douglas, Leonard & Garvey, P.C.
                                14 South Street, Ste. 5
                                Concord, NH  03301
                                (603) 224-1988
                                benjamin@nhlawoffice.com
                                mdouglass@nhlawoffice.com